**Theodore ROZSA, Plaintiff,**

v.

**MAY DAVIS GROUP, INC., Carl Corley, Thomas Baribeau and S.G. Cowen Securities Corp., Defendants.**

**No. 01 CIV 2622(RWS).**

United States District Court,
S.D. New York.

Feb. 13, 2002.

McGuire, Kehl & Nealon, New York, NY, By: Harold F. McGuire, Jr., Arthur V. Nealon, for Plaintiff, of counsel.

Butler, Fitzgerald & Potter, New York, NY, By: Andrew W. Sidman, Marlen Kruzhkov, for Defendant SG Cowen Securities Corp., of counsel.

## OPINION

SWEET, District Judge.

Defendant SG Cowen Securities Corp. ("SG Cowen") has moved to dismiss the First Amended Complaint (the "Amended Complaint") of plaintiff Theodore Rozsa ("Rozsa") pursuant to Rule 12(b)(6), Fed. R.Civ.P. For the reasons set forth below, the motion is granted.

### Prior Proceedings

This action was commenced on March 27, 2001 by the filing of a complaint. SG Cowen moved against that complaint which was dismissed by an opinion of August 1, 2001, reported at 152 F.Supp.2d 526 (S.D.N.Y.2001) (*"Rozsa I"*).

### The Amended Complaint

The allegations as stated in the Amended Complaint are as follows.

Rozsa is an 86–year old Canadian citizen and resident of Alberta, Canada. (Am. Compl.¶ 1).

SG Cowen is a New York securities broker-dealer. (*Id.* ¶ 5).

Defendant May Davis Group, Inc. ("May Davis") is also a New York securities broker-dealer, and defendant Carl Corley ("Corley") was employed by May Davis. (*Id.* ¶¶ 2–3). SG Cowen purported to act as a clearing broker for May Davis, pursuant to undisclosed agreements with May Davis. Rozsa was not a party to any such agreements and was not informed about Cowen's status as a clearing broker. (*Id.* ¶ 5).

Defendant Thomas Baribeau ("Baribeau") is a resident of California; in 1999 Baribeau caused the incorporation of a Nevada corporation, the Aid for Humanity and Benevolence Foundation (the "Foundation"). (*Id.* ¶¶ 4, 8). Baribeau set up a brokerage account in the name of the Foundation at SG Cowen, and then used that account to defraud Rozsa of $5 million which Rozsa had entrusted to SG Cowen. (*Id.* ¶¶ 23–27).

In late 1999, Baribeau persuaded Rozsa to wire $5 million into a " 'sub-account' " of the Foundation, over which Rozsa would be the recorded and beneficial owner and sole signatory. (*Id.* ¶ 9).

Baribeau informed Rozsa that the account would be invested in money market funds, unless Rozsa directed otherwise. Baribeau also stated that Rozsa's funds, and the funds of others, would be employed in "virtually riskless 'program trading,' " involving foreign bank instruments, which would return profits of 15% per trade. (¶ 10). Baribeau also purportedly told Rozsa that SG Cowen would be the "depository" for his funds, and that May Davis was affiliated with or owned by SG Cowen. (*Id.* ¶ 12–13).

Similar contemporaneous statements were made by Baribeau to at least two other prospective depositors. (*Id.* ¶ 11).

On December 10, 1999, Rozsa signed a SG Cowen disclosure election and taxpayer identification form in order to open an account at SG Cowen which listed only Rozsa as owner of the account, and made no mention of the Foundation. (*Id.* ¶ 12).

At the request of May Davis, SG Cowen opened a brokerage account in the name of the Foundation, No. HM10585711 (the "Account") based upon a "New Account Form" filled out by Corley of May Davis, who designated it as a "Master Account." (*Id.* ¶ 14). After Baribeau had informed Rozsa that May Davis was affiliated or owned by SG Cowen, Rozsa, as "owner" of the Account, signed and sent to May Davis a Form W–8 Certificate of Foreign Status on December 13, 1999. (*Id.* ¶ 13).

On or about December 14, 1999, May Davis on behalf of Rozsa proposed to SG Cowen that Rozsa's $5 million would be deposited in a "Sub–Account" of the Foundation, and submitted to SG Cowen forms prepared by Rozsa to accomplish that end. At about the same time, Corley sent to SG Cowen completed SG Cowen "New Account Forms" for proposed "Sub–Accounts" for two other prospective $5 million investors residing in Singapore and New Zealand, respectively. (*Id.* ¶ 15, Exs. C, D, E).

Also on December 14, 1999, Corley prepared and sent to SG Cowen a statement of the "Account Structure and Client Information" for the prospective Master (or Primary) Account and the three Secondary accounts. The Primary Account was in the name of the Foundation, listing Baribeau's name and California address; the Secondary Accounts were in the names of the three individual depositors, not the Foundation, and listed the individuals' addresses and foreign passport information for account signature purposes. (*Id.* ¶ 15).

On December 16, 1999, a person at SG Cowen allegedly advised May Davis that SG Cowen would not open any such "Secondary Account" or "Sub–Account" and directed that the funds belonging to Rozsa and the two other prospective depositors should be earmarked with the notation "FOR THE BENEFIT OF," followed by each depositor's name, and thus deposited in the Foundation's "Master Account" at SG Cowen. SG Cowen's instruction was conveyed to Rozsa through May Davis. (*Id.* ¶ 16).

On December 16, 1999, pursuant to SG Cowen's wire transfer instructions, Rozsa transferred $5 million by wire from Rozsa's account at a Calgary, Alberta branch of the Bank of Montreal to an account at the Bank of New York in the name of SG Cowen, "Ref: May Davis Group, for further credit to: Aid for Humanity and Benevolence Foundation, a/c HM10585711 FOR THE BENEFIT OF: Mr. Theodore Rozsa." (*Id.* ¶ 18).

On December 17, 1999, Corley faxed Rozsa a letter welcoming him to "The May Davis Group." The body of the letter stated in its entirety:

> I would like to welcome you to The May Davis Group.
>
> The May Davis Group is a full service investment banking brokerage firm, fully committed to providing our private and institutional clients with the highest level of investment management services.
>
> Our objective is to help you build your net worth and manage risk. In doing so we can help you achieve your long-term goals. We have at our disposal proprietary analysis to develop the optimal risk/reward strategy for each client. We enjoy a broad capability to monitor market conditions, in order for you to take full advantage of changes. Each account at May Davis is insured up to $100,000.

My Goal is to be accessible to you offering as much information or personal assistance as you may require. My toll free number is (800) 522–0057. I look forward to speaking with you again soon.

(*Id.* ¶ 19, Ex. H). The address on the letter referred to:

Account: HM 10578–5711

Sub acct to: Aid for Humanity

Mr. Theodore Rozsa Signatory

(*Id.*)

On December 20, 1999, Rozsa filled out other SG Cowen forms including a Retail New Account Form and a W–8 Certificate of Foreign Status Form, again allegedly showing Rozsa as the owner of the Account. Rozsa sent those form to May Davis so that they could be included in the SG Cowen account file. According to the Amended Complaint, May Davis received those completed forms from Rozsa with actual or apparent authority to act as SG Cowen's agent. SG Cowen also set up a mechanism by which Rozsa received monthly statements for the Account, reasonably confirming Rozsa his ownership interest in the account. (*Id.* ¶ 20).

On February 9, 2000, Baribeau filled out forms provided by SG Cowen with respect to the account. Without Rozsa's knowledge, Baribeau gave to May Davis an Account Agreement, Margin Account Agreement, and a Certificate and Corporate Resolution of the Foundation authorizing Baribeau to give instructions with respect to the Account. (*Id.* ¶ 23).

SG Cowen accepted these belated forms from May Davis in February, 2000 without questioning them. Although the only funds in the Account had been transferred there by Rozsa and earmarked "FOR THE BENEFIT OF: Mr. Theodore Rozsa" at its own direction, SG Cowen made no effort to contact Rozsa about the fact that Baribeau was now purporting to assume signatory authority over the Account. (*Id.* ¶ 25).

Within a month thereafter, most of the funds in the Account had been looted by wire transfers to out-of-state accounts of the Foundation, as directed by Baribeau and May Davis. By five wire transfers ending on March 17, 2000, the entire $5 million principal in the Account was transferred out. (*Id.* ¶ 26).

SG Cowen did not question the authority of Baribeau or May Davis to dispose of the Account's funds and did not contact Rozsa in connection with any of the transfers, nor send him any debit advices concerning them. (*Id.* ¶ 27).

After completion of the five wire transfers, SG Cowen, purporting to act merely as a clearing broker, prepared statements of account on May Davis forms and mailed them to Rozsa for the months of February and March 2000. (*Id.* ¶ 30).

On July 31, 2000, Rozsa sent a letter to Corley at May Davis, demanding an explanation concerning those transfers and that on August 6, 2000, Corley sent Rozsa a letter in which Corley falsely stated that he did not discuss Rozsa's accounts with Baribeau. (*Id.* ¶¶ 32–33). In August 2000, May Davis allegedly informed Rozsa of certain bank accounts maintained by the Foundation, to which funds in the Account had been transferred, and Rozsa requested Corley and May Davis to advise those banks that they were holding his funds. (*Id.* ¶ 34). In response, Corley and May Davis allegedly informed Baribeau of Rozsa's request so that Baribeau could transfer Rozsa's funds from those banks. (*Id.* ¶ 35).

Between July and September 2000, Baribeau and May Davis arranged for Rozsa to receive $1,400,000 identified as "program trading profits" and $95,000 purport-

edly representing money market interest and capital gains on the funds initially deposited in the Account. These were the only returns Rozsa has ever received on his $5 million deposit. (*Id.* ¶ 36).

The Federal Bureau of Investigation ("FBI") has seized approximately $2 million in cash and property traceable to Rozsa from accounts and entities connected with Baribeau. The seizures were made pursuant to ten seizure warrants issued in the United States District Court for the Central District of California, Western Division, based upon the demonstration of probable cause that the items were obtained with money stolen from Rozsa. Rozsa has submitted claims to the property seized, but his claims have been stayed due to the pendency of criminal proceedings in that district. (*Id.* ¶ 38).

The Amended Complaint contains seven claims. The first claim alleges RICO violations by May Davis, Corley and Baribeau. The second claim asserts that SG Cowen and the other defendants are liable to Rozsa for breach of fiduciary duty. The third claim asserts breach of contract against May Davis. The fourth and fifth claims allege that SG Cowen is liable for breach of contract. The sixth claim asserts that SG Cowen and the other defendants are liable to Rozsa for conversion. The seventh claim asserts that SG Cowen was negligent.

The instant motion to dismiss the Amended Complaint was heard and marked fully submitted on November 28, 2001.

### The Applicable Legal Standard

The applicable legal standard has not changed since its formulation in *Rozsa I:*

> In reviewing a motion to dismiss under Rule 12(b)-(6), review must be limited to the complaint and documents attached or incorporated by reference

thereto. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991). Courts must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993) (*citing IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir.1993)). Dismissal is warranted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). *See also Bass v. Jackson,* 790 F.2d 260, 262 (2d Cir.1986).

> For purposes of a motion to dismiss, [the Second Circuit has] deemed a complaint to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . ., as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (*citing Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)); *Kramer,* 937 F.2d at 774; and *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

152 F.Supp.2d at 530.

■ When allegations contained within the complaint are contradicted by documents attached to the complaint, the documents control, and the Court need not accept the allegations contained within the complaint as true. *DeJesus–Keolamphu v. Village of Pelham Manor,* 999 F.Supp. 556, 563 (S.D.N.Y.1998) (*quoting Sazerac*

*Co., Inc. v. Falk*, 861 F.Supp. 253, 257 (1994)), *aff'd*, 166 F.3d 1199 (2d Cir.1998).

### The Amended Complaint Fails to State a Claim for Breach of Fiduciary Duty by SG Cowen

 The requirements for stating a claim for a breach of fiduciary duty were set forth in *Rozsa I*, 152 F.Supp.2d at 531, and have not changed. As a rule, clearing brokers do not have a fiduciary duty to individual investors.

The additional allegations found in the Amended Complaint are that Rozsa did not know SG Cowen was acting as a clearing broker for May Davis; that someone at SG Cowen told May Davis that Rozsa should send the funds to the Account with the notation that they were for his benefit; that May Davis conveyed that information to Rozsa; and that therefore SG Cowen had a duty not to transfer the funds without Rozsa's authorization.

The cases on which the court relied in *Rozsa I* holding that clearing firms owe no fiduciary duty to customers of their introducing brokers were not predicated on notification of a clearing relationship. *See, e.g., Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 597 (2d Cir.1991). In *In re Adler Coleman Clearing Corp.*, 198 B.R. 70 (Bkrtcy.S.D.N.Y.1996), cited by Rozsa, although the court referred to "fully disclosed" clearing agreements between certain brokers, it premised its ruling with the statement that the clearing broker did not owe a fiduciary duty to customers of introducing brokers, on the "limited services" performed by the clearing broker. *Id.*, 198 B.R. at 73–74.

Rozsa also refers to NYSE rules relating to "Carrying Agreements" and rules relating to the diligence as to accounts and their designation. The assumed breach of these rules does not in itself provide a private right of action. *See Alberti v. Stanley*, 1998 WL 438667, at *4 (S.D.N.Y. July 31, 1998), *aff'd*, 205 F.3d 1321, 2000 WL 19090 (2d Cir.2000); *Richardson v. Shearson/American Express Co., Inc.*, 573 F.Supp. 133, 135 (S.D.N.Y.1983). In the absence of such a private right of action, alleged breaches of regulatory rules do not form the basis for a fiduciary duty. *Cf. Riggs v. Schappell*, 939 F.Supp. 321, 329–332 (D.N.J.1996).

 Further, Rule 382(c), which requires disclosure of a clearing relationship to each "customer" whose account is introduced on a fully-disclosed basis, was inapplicable to Rozsa. According to the Amended Complaint and the documents that it incorporates by reference, notwithstanding the misrepresentations allegedly made by defendants May Davis, Corley, and Baribeau, the "customer" that May Davis introduced to SG Cowen was the Foundation, and not Rozsa. (*See* Am. Compl. ¶¶ 14, 23–25). Rule 406, is not applicable because, contrary to the misrepresentations that defendants other than SG Cowen allegedly made to Rozsa, for purposes of this case, there is no allegation that SG Cowen carried on its books an account in the name of anyone other than May Davis' "customer," the Foundation. Finally, Rule 408, concerning the exercise of discretionary authority in customers' accounts, is irrelevant because Rozsa has not alleged that orders were accepted from anyone other than May Davis' "customer" of record, the Foundation.

The issue remains, as it did before, whether the language "For the benefit of: Mr. Theodore Rozsa" creates a separate fiduciary duty, even if suggested by SG Cowen. No authority for the proposition has been advanced to alter the conclusion reached in *Rozsa I,* that no facts have been alleged to alter SG Cowen's duty beyond that of a generic clearing agent.

The breach of fiduciary duty claim is therefore dismissed.

### The Amended Complaint Fails to State a Claim for Breach of Contract

■ It is Rozsa's contention that when SG Cowen told May Davis that Rozsa's funds should be deposited into the Foundation's Account for the benefit of Rozsa, and later accepted his funds so designated, SG Cowen entered into an implied contract with May Davis, of which Rozsa was the intended beneficiary. Accordingly, SG Cowen would hold those funds for Rozsa's benefit and not transfer them without both Rozsa's authority and documentation that any such transfers were for his benefit.

The single statement by someone at SG Cowen to someone at May Davis that Rozsa should send funds to the Foundation's Account, designated for Rozsa's benefit, does not permit the inference that SG Cowen thereby intended to enter a contract with May Davis, of which Rozsa was the intended beneficiary. Because Rozsa has failed to allege facts that reflect a mutual understanding of contractual obligations such that a contract can be inferred from the conduct of the parties, this claim is dismissed. *See Renner v. Chase Manhattan Bank*, No. 98 Civ. 926(CSH), 2000 WL 781081, at *18–19 (S.D.N.Y. June 16, 2000).

In *Flickinger*, 947 F.2d 595 (2d Cir. 1991), cited by Rozsa, although the court found that the customer of an introducing firm was the third-party beneficiary of an agreement between the introducing firm and the clearing firm, it based that finding on its determination that the clearing firm's breach of its obligations involved performance that was to be rendered directly to the customer. *Id.* at 600. In *DeLeonardis v. Credit Agricole Indosuez*, No. 00 Civ. 0138(HB), 2000 WL 1718543 (S.D.N.Y. Nov.15, 2000), also cited by Rozsa, in denying a motion for summary judg-

ment dismissing plaintiff's claim that he was a third-party beneficiary of his supervisor's employment agreement, the court was clear in pointing out that such agreement "expressly provided various terms of [the supervisor's subordinates'] employment agreements, including compensation. . . ." *Id.* at *4.

With respect to Rozsa's claim that May Davis had the apparent authority to enter into such an agreement on behalf of SG Cowen, Rozsa contends that he has satisfied the requirement that there be allegations of conduct or representations by the principal to the plaintiff which reasonably gave the appearance of an agent's authority to act for the principal, because he has alleged that (i) May Davis transmitted to SG Cowen completed SG Cowen forms for the Foundation's Account, (ii) May Davis relayed to Rozsa SG Cowen's purported directions that Rozsa's funds should be sent to the Foundation's Account designated for Rozsa's benefit, and (iii) SG Cowen permitted May Davis to open the Foundation's Account without sufficient documentation.

These allegations are deficient because none of them constitute representations or conduct directed by the purported principal (SG Cowen) to a third-party (Rozsa). *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1462 (2d Cir.1995). In addition, those assertions run afoul of the proscription that the alleged agent with whom the third-party was dealing, *i.e.*, May Davis, cannot cloak itself with apparent authority. *See Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 10 (2d Cir. 1978).

Rozsa also argues that Exhibit H to the Amended Complaint, May Davis's letter to Rozsa dated December 17, 1999, is "wholly consistent with the impression reasonably given to Rozsa that May Davis was autho-

rized to speak and act for SG Cowen." (Pl. Mem. at 18). However, the letter, which welcomes Rozsa to May Davis, a "full service investment banking and brokerage firm," does not mention SG Cowen and by its terms shows unequivocally that May Davis was dealing with Rozsa as a principal. Because it is a document attached to the Amended Complaint which contradicts Rozsa's allegations based upon an agency relationship between SG Cowen and May Davis, the agency allegations need not be accepted as true for purposes of this motion. *See DeJesus–Keolamphu,* 999 F.Supp. at 563.

The allegations of conversations between SG Cowen and May Davis, and acts consistent with those conversations, do not create a contractual relationship with Rozsa.

The breach of contract claim against SG Cowen is dismissed.

### The Amended Complaint Fails to State a Claim for Conversion

■ Rozsa argues that he has pled a claim for conversion in accordance with the five-element standard that the Court set forth in *Rozsa I,* 152 F.Supp.2d at 534, because paragraphs 15 and 16 of the Amended Complaint allege that, upon information and belief that SG Cowen rejected a proposal by May Davis to create a separate sub-account for Rozsa, SG Cowen told May Davis that Rozsa should send his funds to the Foundation's Account, with the notation that they were for Rozsa's benefit; that May Davis relayed that information to Rozsa; that Rozsa did so; and that SG Cowen subsequently transferred funds from the Account at the Foundation's request. (Pl. Mem. at 18–20).

Irrespective of what SG Cowen told May Davis, and what May Davis told Rozsa, as shown by the Amended Complaint and documents referred to therein, Rozsa's funds were deposited into the Account owned by the Foundation, and the Account itself never contained any designation that it was for Rozsa's "benefit." (*See* Am. Compl. ¶¶ 14, 18, 23–24). Accordingly, when SG Cowen transferred those funds from the Account pursuant to the Foundation's instructions, Rozsa no longer had "ownership" of the funds, nor was the Account a "specific and identifiable" fund of Rozsa. There were no facts alleged upon which it could be assumed that Rozsa controlled the Account of the Fund. *See Pinnacle Consultants, Ltd. v. Leucadia National Corp.,* 923 F.Supp. 439, 447 (S.D.N.Y.1995), *aff'd,* 101 F.3d 900 (2d Cir. 1996).

The conversion claim is dismissed.

### The Amended Complaint Fails to State a Claim of Negligence

■ In Rozsa's final claim, he alleges that SG Cowen was negligent in that it breached two duties to Rozsa: (i) a duty of care to safeguard Rozsa's funds so as to prevent such funds being "transferred to Rozsa's detriment," and (ii) a duty of inquiry that it assumed when it purportedly came to know of "irregularities in the various instructions submitted to it by May Davis." (Am.Compl.¶¶ 72–73).

■ A claim for negligence should be dismissed where a plaintiff has failed to plead facts that would establish the requisite elements of: (i) the existence of a duty flowing from defendant to plaintiff; (ii) a breach of that duty; (iii) a reasonably close causal connection between the acts in issue and the resulting injury; and (iv) actual loss, harm or damage. *Renner v. Chase Manhattan Bank,* No. 98 Civ. 926(CSH), 2000 WL 781081, at *21 (S.D.N.Y. June 16, 2000) (*citing Integrated Waste Services, Inc. v. Akzo Nobel Salt, Inc.,* 113 F.3d 296, 299 (2d Cir.1997)). Courts have determined that clearing brokers do not owe duties to plaintiffs who are customers of their introducing brokers. *See, e.g., Riggs,*

939 F.Supp. at 329–332 (dismissing negligence claim against clearing broker); *Greenberg v. Bear Stearns & Co.,* 220 F.3d 22, 28–29 (2d Cir.2000) (no duty of clearing broker to make inquiry re introducing broker's alleged undisclosed and excessive profits and to inform introducing broker's customers); *In re Blech Securities Litigation,* 928 F.Supp. 1279, 1295–96 (S.D.N.Y. 1996) (a clearing broker owed no duty of disclosure to clients of an introducing broker).

Rozsa contends that the cases holding that clearing brokers do not owe a duty to customers of their introducing firms are inapplicable because he was not informed that SG Cowen was acting as May Davis's clearing broker; and SG Cowen owed Rozsa a duty pursuant to (i) NYSE Rules 382, 405, 406, and 408; (ii) New York UCC § 3–205, concerning restrictive endorsements; (iii) a release issued by The Society for Worldwide Interbank Financial Telecommunication ("SWIFT"), a "bank-owned cooperative," which may have been applicable to the transfer of funds in issue; and (iv) SG Cowen's alleged failure to comply with the standards of the brokerage community. (Pl. Mem. at 20–23).

However, the cases cited by SG Cowen for the proposition that clearing brokers do not owe a duty to customers of their introducing firms are not predicated on the existence of a fully-disclosed clearing relationship. *See, e.g., Greenberg,* 220 F.3d at 28–29. For the reasons set forth above, the NYSE rules cited by Rozsa do not establish any duty owed by SG Cowen to him and, in any event, he has not shown that SG Cowen violated any such rules. UCC § 3–205 addresses restrictive endorsements with respect to commercial paper, and therefore it is inapplicable to this case. Rozsa has not alleged or otherwise shown that the alleged transfer of funds from his bank to SG Cowen's bank was

effected through SWIFT, and he has not shown that SWIFT established any duty owed by SG Cowen to Rozsa. Rozsa's references to standards within the brokerage community certainly do not establish any such duty. *See Riggs,* 939 F.Supp. at 332 n. 15.

The cause of action for negligence is dismissed.

### Conclusion

This is Rozsa's second effort to state a claim against SG Cowen. Under these circumstances, the Amended Complaint is dismissed with prejudice for failure to state a claim without leave to replead. *See Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999).

It is so ordered.